UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BOMIN GREECE S.A.,

       Plaintiff,

v.

M/V GENCO SUCCESS (IMO 9121730),
her engines, freights, apparel, appurtenances,
tackle, etc., in rem,

       Defendant.
_____

1:16-CV-1500
(GTS/CFH)

APPEARANCES:          OF COUNSEL:

CHALOS & CO., P.C.        GEORGE M. CHALOS, ESQ.
 Counsel for Plaintiff        BRITON P. SPARKMAN, ESQ.
55 Hamilton Avenue         MELISSA D. PATZELT-RUSSO, ESQ.
Oyster Bay, NY 11710

HOLLAND & KNIGHT        JAMES H. POWER, ESQ.
 Counsel for Defendant and Claimant
31 West 52nd Street
New York, NY 10019

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

   Currently before the Court, in this maritime action by Bomin Greece S.A. ("Plaintiff") against M/V Genco Success ("Defendant" or the "Vessel"), is a motion by Genco Success Ltd. ("Claimant" or "Genco") to vacate the Court's Order for the Maritime Arrest of the Vessel. (Dkt. No. 19.) For the reasons set forth below, Claimant's motion to vacate is granted.

## I. RELEVANT BACKGROUND

Because the parties have (in their motion papers) demonstrated an adequate understanding of the action's procedural history, the facts giving rise to the action, and the parties' arguments on the current motion, the Court will not recite that information in this Decision and Order, which is intended primarily for the review of the parties, but will respectfully refer the reader to the Court's Decision and Order of March 31, 2017. (Dkt. No. 32.)

## II. GOVERNING LEGAL STANDARD

Supplemental Admiralty Rule E(4)(f) provides that, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Adm. Supp. R. E(4)(f). To avoid vacatur of arrest, it is the plaintiff's burden to affirmatively demonstrate its entitlement to a maritime lien. *Bay Casino, LLC. v. M. V. Royal Empress*, 20 F. Supp. 2d 440, 448 (E.D.N.Y. 1988); *Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad*, 591 F.3d 1208, 1210 (9th Cir. 2010).

The Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, provides for a statutory maritime lien for the supply of necessaries where the plaintiff has provided necessaries to a vessel on the order of the owner or "a person authorized by the owner." 46 U.S.C. § 31341(a). Among persons presumed to be "a person authorized by the owner" are "the master," "a person entrusted with the management of the vessel at the port of supply," or "an officer or agent appointed by . . . a charterer . . . ." 46 U.S.C. § 31341(a); *see also Galehead,*

2

*Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999) ("A charterer is authorized under the statute to bind a vessel for necessaries."); *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1127-28 (9th Cir. 2008) ("Charterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries."); *Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff*, 913 F. Supp. 919, 922 (D. Md. 1995) ("A time charterers ordinarily holds sufficient

legal authority over the management of a chartered vessel to subject the vessel to maritime liens.").

"Although a charterer is presumed to have authority to bind the vessel, the lien does not vest absolutely as a matter of law." *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1512 (11th Cir. 1985). A maritime lien does not arise "when necessaries are ordered by one without authority to bind the vessel where the vessel owner can show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense." *World Fuel Serv. Trading, DMCC v. M/V HEBEI SHIJAZHUANG*, 12 F. Supp.3d 792, 808 (E.D. Va. 2014); *see also See also Belcher Oil Co.*, 766 F.2d at 1512 ("If the person who order the services is not authorized by the owner to create liens and if the furnisher of the services has notice of the lack of authority, it is entirely clear that no lien will arise.") (citing Gilmore & Black, *The Law of Admiralty, 2d Ed.* at 685); *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 749 (5th Cir. 1985) (noting that the legislative history of CIMLA supports the policy that a physical supplier does not have a lien "when a physical supplier has actual knowledge of a prohibition of lien clause" contained in a charter party). In other words, the presumption that a charterer has authority to bind a vessel to a maritime lien is "rebutted" or "overcome" where a defendant has

3

shown that a supplier of necessaries has actual knowledge of the charterer's lack of authority to bind a vessel. *Belcher Oil Co.*, 766 F.2d at 1509; *Lake Union Drydock Co. v. M/V POLAR VIKING*, 446 F. Supp. 1286, 1291 (W.D. Wash. 1978).

Granted, the addition of a "no-lien stamp" or "disclaimer stamp" affixed to a bunker delivery note is insufficient to provide such notice. *Am. Oil Trading, Inc. v. M/V SAVA,* 47 F. Supp.2d 348, 352 (E.D.N.Y. 1999); *O.W. Bunker Malta Ltd. v. M/V TROGIR*, 602 F. App'x 673, 679 (9th Cir. 2015); *Empire Scott Stevedoring, Inc. v. M/V STEVNS PEARL*, 98-CV-1818, 1998 U.S. Dist. LEXIS 14607, at *9 (E.D. La. Sept. 10, 1998); *Gulf Oil Trading Co. v. M/V FREEDOM*, 84-CV-0425, 1985 U.S. Dist. LEXIS 23790, at *3, 7-8 (D. Ore. July 25, 1985). However, an "affirmative communication" to the supplier may provide such notice. *Cal Dive Offshore Contractors, Inc. v. M/V Sampson*, 15-CV-2788, 2017 WL 1157125, at *6 (S.D.N.Y. March 27, 2017); *O.W. Bunker Malta Ltd. v. M/V Trogir*, 12-CV-5657, 2013 U.S. Dist. LEXIS 19026, at *7-8 (C.D. Cal. Jan. 29, 2013), *aff'd*, *O.W. Bunker Malta Ltd. v. M/V Trogir*, 602 F. App'x 673 (9th Cir. 2015).

The "supplier" does not include merely the contract supplier but may include the physical supplier if the vessel owner had no knowledge of any other fuel supplier involved in the transaction. *See Hampton Bermuda Ltd. v. M/V STAR SIRANGER*, 05-H-3074, 2008 A.M.C. 1352, at 1359 (S.D. Tex. Aug. 18, 2008) ("[A]ctual notice must be given to the supplier of the necessary, *or to another entity in the supply chain known to the vessel owner. . . .* On the facts presented to the Court at trial, the vessel provided actual notice of the 'no-lien clause' to Colonial Oil, the physical supplier of the bunkers. Although Colonial Oil served as an independent contractor to Hampton Bermuda, *it is undisputed that the vessel had no knowledge*

4

*of any other fuel supplier involved in the transaction*, including any Hampton entity.") (emphasis added) (citing *Gulf Oil Trading*, 757 F.2d at 750-51). However, such a supplier is distinguishable from a mere "intermediary" (used to deliver the necessaries in question) who had no "effect on the relationship" between the supplier and the charterer. *See O.W. Bunker Malta Ltd. v. M/V Trogir*, 602 F. App'x 673, 676 (9th Cir. 2015) ("There is no evidence that OWB's use of an intermediary to deliver the fuel had any effect on the relationship between OWB and the charterer.").[1]

The burden of showing this actual knowledge is on the owner of the vessel. *See Lake Union Drydock Co. v. M/V POLAR VIKING*, 446 F. Supp. 1286, 1291 (W.D. Wash. 1978) ("The owner of a vessel must now establish that the materialman had actual knowledge of a no-lien clause if he is to overcome the materialman's statutory presumption. The imposition of this

---

[1] Three district court cases exist for the point of law that the employee of such a supplier must have "the ability to effect the negotiations and the contract prior to the time the contract is entered into." *O.W. Bunker Malta Ltd. v. M/V Trogir*, 12-CV-5657, 2013 U.S. Dist. LEXIS 19026, at *7 (C.D. Cal. Jan. 29, 2013); *accord, World Fuel Servs. Trading v. M/V Hebei Shijiazhuang*, 12 F. Supp.3d 792, 809 (E.D. Va. 2014); *Cal Dive Offshore Contractors, Inc.*, 2017 WL 1157125, at *5. Under the circumstances, the Court must respectfully decline to follow these cases. The point of law the cases rely on is based merely on a general citation to *Gulf Oil Trading*, 757 F.2d 743 (9th Cir. 2015). *See O.W. Bunker Malta Ltd.*, 2013 U.S. Dist. LEXIS 19026, at *7 (citing *Gulf Oil Trading*, 757 F.2d 743 [9th Cir. 2015]). However, the closest that *Gulf Oil Trading* comes to supporting this point of law is finding that "Fairplay produced nothing to indicate that the master of the barge served as anything more than an intermediary in the delivery of these papers . . . ." *Gulf Oil Trading*, 757 F.2d at 750 ("The essence of Fairplay's argument is that since the master of the barge was entrusted with delivering the papers containing the technical specifications of the bunkers and with returning the delivery receipt to Gulf, the master was Gulf's agent for all purposes connected with these papers. Thus, Fairplay's reasoning runs, Gulf is chargeable with the notice of the prohibition of lien clause given to the master of the barge on the delivery receipt. The district court correctly rejected this argument."). This is an insufficient grounds on which to add the relatively strict condition of requiring the ability to effect *both* the negotiations *and* the contract *prior to the time the contract is entered into*.

burden is supported by the legislative history. Congress intended to place the greater burden upon the vessel owner: 'As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel than can the [supplier] who furnishes necessaries to a vessel under great economic pressure to put back to sea.'") (quoting 2 U.S. Code Cong. & Admin. News p. 1365 [1971]).

## III. ANALYSIS

As explained above, even though the adding of a remark to a bunker delivery note does not suffice to alter a plaintiff's right to enforce a lien, an affirmative communication may suffice to alter a plaintiff's right to enforce a lien if made to the supplier of necessaries.

As a result, the first issue before the Court is whether such an affirmative communication was made in this case. Claimant has adduced persuasive evidence that, before the delivery of bunker fuel, the Chief Engineer of the Vessel made oral statements to the Captain of the bunker-supply barge M/T SACOR II (the "bunker-supply barge") expressly disclaiming any lien against the Vessel as a result of the delivery of bunker fuel. Specifically, in addition to requesting in vain that the Captain add (to the bunker delivery note) a remark stating that the supply of bunker fuel was being made solely on the order of Caltrek Freight and Trading Ltd. ("Caltrek" or "the charterer") and not on the credit of the Vessel, the Chief Engineer "protest[ed]" to the Captain that no lien against the Vessel was being created, and "expressly and unequivocally informed" the Captain that the supply of bunker fuel was not on the credit of the Vessel (specifically referencing the lien clause in the Charter Party); and both the Chief Engineer and the Master advised the Captain that "the loading of fuel was at [his] and [his] principals' own risk." (Dkt. No. 19, Attach. 4, at ¶¶ 7, 8, 9 [Zhuang Shao Guang Decl.]; Hrg. Ex. D-6, at ¶¶ 6, 9 [Second

6

Zhuang Shao Guang Decl.]; Dkt. No. 19, Attach. 3, at ¶¶ 9, 10, 11 [Qiao Jun Zhi Decl.]; Hrg. Ex. D-5, at ¶ 9 [Second Qiao Jun Zhi Decl.].)[2] As a result, the Court finds that an affirmative communication was made in this case.

The Court pauses to explain that, while ordinarily it would at a hearing afford little weight to a declaration (because no opportunity for cross-examining the declarant was provided), here, there were four declarations by two declarants, those declarations were consistent, the declarants had a plausible explanation for non-appearance, and Plaintiff has failed to adduce competent evidence contradicting the declarants' testimony. Specifically, Plaintiff has failed to adduce the hearing testimony of the Captain of the bunker-supply barge, an affidavit of the Captain, or even the name of the Captain. (*See, e.g.,* Hrg. Tr. at 29-31 [Hrg. Testimony of Plaintiff's Managing Director, Andrés Bereilh, testifying that he neither talked to the Captain of the bunker-supply barge nor instructed someone to do so, and that he did not know the name of the barge representative at the pre-bunkering meeting].) Instead, Plaintiff has offered only an affidavit based on a lack of personal knowledge and/or speculation. (Dkt. No. 28, Attach. 2, at ¶¶ 9, 10 [Decl. of Petrogal's Marine Sales Manager, Luis Sampaio Nunes, implying, without personal knowledge, that "[a]t no time prior to the delivery did [the Captain of the bunker-supply barge] receive notice that there was a no-lien provision applied to the delivery," and implying,

---

[2] The Court notes that, contrary to Plaintiff's implication, the General Conditions of Sale and Delivery does not provide that the lien is non-alterable. Rather, Section 7.14 of the General Conditions of Sale and Delivery provides merely that "[t]he *Supplier's* right to apply and enforce a maritime lien will not be altered, waived or impaired by the application to the Bunker Delivery Note of any disclaimer *stamp*." (Hrg. Ex. P-2, at 2 [emphasis added].) Setting aside the fact that the "Supplier" is not attempting to enforce a lien in this action, the fact remains that Claimant's affirmative communications (which were both oral and conspicuous) were not a stamp (which is physical and has the capacity to be inconspicuous).

7

speculatively, that the supply documents provided by the Surveyor of SGS Portugal, S.A., would have contained a remark about a reservation or protest, had one been orally made at the pre-bunkering meeting]; Hrg. Tr. at 45 [Hrg. Argument of Plaintiff's counsel, testifying that Petrogal's Marine Sales Manager, Luis Sampaio Nunes, possesses no relevant information other than contained in his declaration].)

The issue then becomes whether the Captain of the bunker-supply barge was an employee of the supplier or was an employee of merely an "intermediary" (used to deliver the necessaries in question) which had no "effect on the relationship" between the supplier and the charterer. The record contains persuasive evidence that the supplier was Petrogal S.A. ("Petrogal"). (*See, e.g.,* Hrg. Ex. P-1 [Confirmation of Order, referencing Supplier as "Petrogal SA"].) The record also contains persuasive evidence that the bunker-supply barge which made physical delivery of the bunker fuel was owned by "Sacor Maritima SA," a wholly owned subsidiary of Petrogal. (Dkt. No. 30, Attach. 1, at ¶ 16 [Second Vassilakis Decl.]; Hrg. Tr. at 69-70 [Hrg. Testimony of Steve Vassilakis, Commercial Manager of Vessel]; *see also* Hrg. Tr. at 10-11, 22-23 [Hrg. Testimony of Andrés Bereilh, testifying that the company that made physical delivery of the product, i.e., the owner of the bunker-supply barge, was Petrogal S.A.].) Indeed, Petrogal's Marine Sales Manager, Luis Sampaio Nunes, refers to the bunker-supply barge as "Petrogal's supply barge." (Dkt. No. 28, Attach. 2, at ¶ 9 [Nunes Decl.].) As a result, the Court finds that the Captain of the bunker-supply barge was an employee of the supplier.[3]

---

[3] The Court notes that, while the above-stated evidence is sufficient to support the Court's finding that the Captain of the bunker-supply barge was an employee of the supplier, the Court also relies on the fact that the Confirmation of Order indicated that Plaintiff's agent would be present at the time of delivery (i.e., the pre-bunkering meeting) to "ensure smooth delivery." (Hrg. Ex. P-1; Hrg. Tr. at 30, 32 [Hrg. Testimony of Andrés Bereilh, testifying that the pre-

The Court emphasizes that it has difficulty reaching any other conclusion. For example, even if the bunker-supply barge were found to have *not* been owned by Petrogal (e.g., rendering the owner of the bunker-supply barge a physical supplier that was legally distinct from the supplier Petrogral), Claimant has adduced persuasive evidence that the Master and Chief Engineer had no knowledge of any bunker-fuel supplier other than Petrogal. (Dkt. No. 19, Attach. 3, at ¶¶ 6, 7, 10 [Qiao Jun Zhi Decl., testifying that on April 4 he was first told of the supplier's name, i.e., Petrogal, and indicating that he did not know that the bunker-supply barge was owned by an entity other than the supplier]; Hrg. Ex. D-5, at ¶¶ 6, 8, 9, 12, 14 [Second Qiao Jun Zhi Decl., indicating that he understood the owner of the bunker-supply barge and Petrogal to be one and the same]; Dkt. No. 19, Attach. 4, at ¶ 5 [Zhuang Shao Guang Decl., indicating that he did not know that the bunker-supply barge was owned by an entity other than the supplier, Petrogal]; Hrg. Ex. D-6, at ¶¶ 6, 8, 9, 12, 14 [Second Zhuang Shao Guang Decl., testifying that he understood the owner of the bunker-supply barge and Petrogal to be one and

bunkering meeting was "mandatory" to ensure the "smooth" delivery of the product].) The sole persons present at the pre-bunkering meeting were the Master, Chief Engineer, Fitter and Electrical Engineer of the Vessel, and the Captain of the bunker-supply barge (and *possibly* the Surveyor of SGS Portugal, S.A., which Plaintiff does not argue was its "agent"). (Dkt. No. 19, Attach. 3, at ¶¶ 8, 9, 10, 11 [Qiao Jun Zhi Decl.]; Hrg. Ex. D-5, at ¶¶ 6, 14 [Second Qiao Jun Zhi Decl.]; Dkt. No. 19, Attach. 4, at ¶¶ 5, 7, 8, 9 [Zhuang Shao Guang Decl.]; Hrg. Ex. D-6, at ¶ 6 [Second Zhuang Shao Guang Decl.]; *cf.* Dkt. No. 28, Attach. 2, at ¶¶ 9, 10, 13 [Nunes Decl.].) The Court notes also that, although Plaintiff argues that its "agent" was not Petrogal but Navex, the Court finds that the hearing testimony it offered to support that argument was not credible; and the affidavit testimony it offers to support that argument in fact supports a contrary conclusion, i.e., that Navex was the agent of *Petrogal*. (Dkt. No. 28, Attach. 2, at ¶ 12 [Nunes Decl., referring to an email from Navex as an email to Petrogal's operation department from "its" agent, i.e., *Petrogal's* agent].)

the same].)[4]

Moreover, even assuming the law requires that the owner of the bunker-supply barge had "the ability to effect the negotiations and the contract prior to the time the contract is entered into" (*see, supra,* note 1 of this Decision and Order), the Court finds that the owner had that ability here. Specifically, regardless of whether the Captain of the bunker-supply barge by himself had "the authority to renegotiate" the contract (a fact argued by Plaintiff and irrelevant under the assumed point of law), the owner of the bunker-supply barge had the ability to "effect" negotiations and the contract prior to the time the contract was entered into by insisting that it did not have a duty to Plaintiff to communicate to Plaintiff any protest by the Vessel's owner at the pre-bunkering meeting that the charterer did not have the authority to bind the Vessel.[5] Furthermore, if the strict condition that the ability exist "prior to the time the contract is entered into" were dispensed with, the Captain of the bunker-supply barge certainly had the ability to "effect" a renegotiation of the contract by communicating the Vessel owner's protest to Plaintiff and delaying delivery until he received a response from Plaintiff, in fulfillment of his duty to "ensure smooth delivery." (Hrg. Ex. P-1.)

---

[4] The Court notes that Claimant adduced persuasive evidence that the Master and Chief Engineer did not know who the seller was, that they knew only that the supplier was Petrogal, and that the pre-bunkering meeting on April 4 was the first chance they had to speak to the supplier. (Dkt. No. 19, Attach. 3, at ¶¶ 4, 5, 6, 7, 8, 10 [Qiao Jun Zhi Decl.]; Hrg. Ex. D-5, at ¶ 14 [Second Qiao Jun Zhi Decl.]; Dkt. No. 19, Attach. 4, at ¶ 5 [Zhuang Shao Guang Decl.]; Hrg. Ex. D-6, at ¶ 14 [Second Zhuang Shao Guang Decl.].)

[5] The Court notes that the Confirmation of Order includes a declaration by Petrogal "that the fuel delivery is in conformity with [various] regulations . . . and . . . certificates," indicating that the Confirmation of Order could have also included a declaration by Petrogal that it did not have a duty to communicate to Plaintiff any protest by the Vessel's owner at the pre-bunkering meeting that the charterer did not have the authority to bind the Vessel. (Hrg. Ex. P-1.)

For all of these reasons, the Court finds that the Master and Chief Engineer's pre-delivery affirmative communications to the Captain of the bunker-supply barge were sufficient to alter Plaintiff's right to enforce a lien.  Simply stated, if Plaintiff cannot collect the amount due from Caltrek, its remedy lies with Petrogal, not with Claimant, under the facts presented: no statutory lien against the Vessel has been shown.

**ACCORDINGLY**, it is

**ORDERED** that Claimant's motion to vacate the Court's Order for the Maritime Arrest of the Vessel (Dkt. No. 19) is **GRANTED**; and it is further

**ORDERED** that the Court's Order for the Maritime Arrest of the Vessel (Dkt. No. 8) is **VACATED**.

Dated: May 30, 2017
Syracuse, New York

_____
Hon. Glenn T. Suddaby
Chief U.S. District Judge